UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL HOWARD,<br><br>          Plaintiff,<br><br>   v.<br><br>TANIUM, INC.,<br><br>          Defendant. | Case No. 21-cv-09703-JSC<br><br>**ORDER RE: MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 44 |

     Daniel Howard filed suit against his former employer, Tanium, alleging Tanium fraudulently induced Plaintiff to join Tanium as an employee. Defendant moves for summary judgment. After carefully reviewing the papers submitted and having had the benefit of oral argument on February 16, 2023, the Court GRANTS Defendant's motion for summary judgment. Because Plaintiff fails to provide sufficient evidence Defendant knew its representation was false (or made the representation recklessly), Defendant's motion for summary judgment is granted.

## BACKGROUND

### I. Factual Background

#### A. Plaintiff's Background

     Plaintiff is a law school graduate and a member of the California Bar. (*See* Dkt. No. 44-8 at 6-7.)[1] Between 1996 and 2016, Plaintiff worked as a "technical writer" or "editor" at seven technology companies. (*Id.*) Some of these companies were publicly traded. (Dkt. No. 45-2 at 109.) Others were private. (*Id.* at 110.) At previous employers, Plaintiff received equity as compensation—both in form of restricted stock units ("RSUs") and stock options. (Dkt. No. 44-3 at 16.)

     Between 2014 and 2016, Plaintiff worked at Fortinet, a publicly traded technology company. (Dkt. No. 44-8 at 6.) During his time at Fortinet, Plaintiff was offered 3,900 RSUs.

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

(Dkt. No 45-2 at 27.)  As of early 2016, Plaintiff had an annual cash salary of $154,500, (*id.* at 32), received an additional 10 to 20 percent bonus each year, and had an opportunity to purchase more Fortinet stock (worth up to 15 precent of his salary) at a low price through the company's Employee Stock Purchase Plan ("ESPP"), (*id.* at 40).  In March 2016, roughly 3000 of Plaintiff's RSUs were unvested, which he estimates comprised $90,000 in value. (*Id.*)

### B.     Tanium's Offer to Plaintiff

In March 2016, Plaintiff received a LinkedIn notification informing him he was a match for a role at Tanium.  (*Id.* at 28.)  Plaintiff then applied for a technical writer position at Tanium. (*Id.*)  At his deposition, Plaintiff asserted he was not looking to leave Fortinet prior to the LinkedIn notification. (*Id.*) But he applied because he had heard of Tanium. (*Id.*)

Plaintiff then began the formal interview process.  Plaintiff told a Tanium recruiter he expected to be paid "more than [he was] making at Fortinet."  (Dkt. No 45-2 at 32.)  Plaintiff then interviewed with James Evans, an Engineering Manager at Tanium who served as the hiring manager for the technical writer position.  (Dkt. No. 44-16 ¶ 2.)  Plaintiff says Evans told him "things were moving fast," and Tanium was "getting ready for an IPO."  (Dkt. No 45-2 at 36.) Evans invited Plaintiff for an on-site interview.  (*Id.* at 38.)  There, Plaintiff interviewed with Tanium's co-founder, David Hindawi.  (*Id.* at 39.)  Plaintiff remembers telling Hindawi about his salary, bonus structure, and the ESPP at Fortinet.  (*Id.*)  He did not ask Hindawi about Tanium's current value or stock price.  (*Id.*)  He later gave the same salary information to Evans and Evans promised to confer with Hindawi regarding a job offer.  (*Id.* at 49.)  That night, Evans extended an offer to Plaintiff via telephone.  According to Plaintiff, the offer was as follows:

> $165,000. 25 percent of the [Technical Account Manager] bonus. Evans said, "A [Technical Account Manager] bonus last year was $105,000." He said, "30,000 shares of stock vesting over four years.· Stock has a current fair market value of $5 a share.  30,000 times five equals $150,000 current value subject to vesting."

(Dkt. No. 45-2 at 50.)  The shares were RSUs, not stock options.  (*Id.* at 51.)  Plaintiff understood the difference between RSUs and stock options—namely, unlike options, the cost basis for an RSU is zero, so Plaintiff is entitled to the full value of a vested RSU when an opportunity to liquidate arises.  (*Id.* at 17.)  Thus, Plaintiff understood the offer to mean he was receiving 30,000

2

shares worth $5.00 a share at that moment. (*Id.* at 52.) But Plaintiff knew this current value did not guarantee he would receive $5.00 per share when a sale event occurred after the vesting period. (*Id.*) Plaintiff was "blown away" by the offer and accepted. (*Id.*) He testified he accepted the offer because "150 is more than 90," where 150 represents the $150,000 March 2016 share value Tanium allegedly represented and $90,000 represents the value of unvested RSUs Plaintiff forwent from Fortinet (as of March 2016). (*Id.* at 62.) Evans does not remember the terms of his offer to Plaintiff. (Dkt. No. 44-16 ¶ 3.)

After Evans made Plaintiff the oral offer, Evans emailed Eric Brown, Tanium's CFO and COO, Hindawi, and Mike Curren, Tanium's Vice President for Talent Acquisition. (Dkt. No. 45-3 at 1.) The email states:

> We'd like to make an offer to Daniel Howard. Details are below.
>   Proposed Tanium Compensation
>   OTE: N/A
>   Base: $165,000.00
>   RSU's: 30,000
>   Bonus Program: TAM @ 25%
>   Start Date: No later than 4/18/16
> Having closed on these figures with Eric and David, I verbally communicated them to Daniel and he has accepted. We're ready to prep an offer letter and send it over.

Plaintiff then received an offer letter. The offer letter lists a $165,000 salary, a grant of 30,000 RSUs vesting over four years, and the promised bonus of 25 percent of the Technical Account Manger bonus. (Dkt. No. 44-4 at 2-3). The offer letter does not include any valuation for the 30,000 RSUs. (*Id.*) Nor did the "Notice of Restricted Stock Unit Award" memo that followed. (Dkt. No. 44-5.) The RSU agreement does state: "the future value of the underlying Shares is unknown, indeterminable and cannot be predicted." (Dkt. No. 44-5 at 8.)

### 1. Tanium's Value in March 2016

Tanium is a private, closely held corporation. (Dkt. No. 44-14 ¶ 2.) In August 2015, private investors purchased Tanium shares for $15/share. (Dkt. No. 44-14 ¶ 3.) Tanium split its shares on a 3-to-1 basis, providing each shareholder with 3 shares for every 1 share held. (*Id.*) Tanium executives claim the company was, thus, valued at roughly $5.00 per share in March 2016 when Plaintiff signed his offer. (*Id.*)

3

On February 19, 2016, however, Grant Thornton LLP delivered a memorandum to Tanium's CFO and COO, Eric Brown. That memorandum, entitled "Re: Valuation Services in Connection with IRC Section 409A and Fair Value Reporting," determined that the "Common Stock" for Tanium was valued at $2.01 as of December 31, 2015. (Dkt. No. 45-9 at 1.) The report estimated the stock value for "financial reporting and tax compliance purposes." (*Id.*) It also states that "[Tanium] plans to use this report solely for the purpose of granted employee stock reports." (*Id.*)

### 2. Tanium's Hiring Practices

Evans declares he did not know about the 409A valuation at $2.01 when he offered Plaintiff 30,000 RSUs valued at $5.00 per share. (Dkt. No. 44-16 ¶ 3.) Rather, Evans relied on "whatever equity event had most recently happened." (Dkt. No. 45-4 at 21.) Evans typically received that pricing information from Hindawi's public announcements to the Tanium team. (*Id.*) Mike Curren, Tanium's VP for Global Talent, also states he was not privy to a specific 409A value. (Dkt. No. 45-10 at 28.) Curren testified Tanium conducted no formal training for hiring managers on how to value stock options. (*Id.* at 25.) Instead, Tanium's practice was to tell prospective employees the "last transacted value," (*id.* at 26-27), and Tanium remained "laser focused on what was the last time somebody – what's the dollar amount somebody actually paid for an RSU in common stock at Tanium, not what accounting firms would do." (*Id.* at 31.)

A recruiter, Melissa Villalobos, testified Curren told her to communicate the $5.00 per share price with prospective employees rather than the 409A value. (Dkt. No. 45-11 at 17-18.) According to Villalobos, Curren instructed recruiters the last transaction value was a better marker of Tanium's price because when sales occurred in the past, the 409A value was lower than the sale price. (Dkt. No. 45-11 at 18.) So, by giving candidates the last transaction price rather than the 409A value, Villalobos testified Tanium aimed to "make sure people have a good understanding of what it is before they sign and to make it more exciting." (*Id.* at 18.) At oral argument, Plaintiff's counsel confirmed this conversation occurred *after* Plaintiff was hired, and Villalobos was never involved in Plaintiff's recruitment.

4

**D.     Subsequent Events**

Plaintiff signed the offer letter and RSU agreement. (Dkt. Nos. 44-4; 44-5.) Plaintiff then began working at Tanium and vesting RSUs. (See Dkt. No. 44-9.) In June 2018, Tanium made a formal offer to repurchase employees' RSUs for between $10 and $12 per share. (Dkt. No. 44-3 at 44.) Plaintiff declined to sell. (*Id.* at 45.) A few months later, Tanium implemented a new portal to allow employees to manage stock options. (Dkt. No. 45-2 at 81.) When Plaintiff logged into the portal, he learned his initial shares had been listed at $2.01 per share for 409A purposes as of March 2016. (*Id.* at 82.)

Tanium then changed Plaintiff's role and compensation formula in 2019. (Dkt. No. 44-6.) As of April 2019, his annual salary remained $165,000, but his bonus target was changed to 15 percent of his base salary. (*Id.*) Tanium also granted Plaintiff an additional 3,000 RSUs. (Dkt. No. 44-8 at 16.) In August 2019, Tanium again offered to purchase shares from employees for $12.95 per share. (*Id.*) Plaintiff again declined to sell. (Dkt. No. 45-2 at 90.)

Eventually, Plaintiff quit Tanium in 2020, shortly after his initial grant of 30,000 RSUs fully vested. (Dkt. No. 44-7 at 3.) As of March 2022, Tanium's 409A valuation was $10.31 per share. (Dkt. No. 44-9 at 3.)

**II.     Procedural History**

Plaintiff sued Tanium for fraud in San Mateo County Superior Court. Tanium removed this matter to this Court based on 28 U.S.C. § 1332. Plaintiff alleges Tanium misrepresented the value of the RSUs in March 2016 to induce Plaintiff to join Tanium and leave Fortinet. As a result of this alleged misrepresentation, Plaintiff claims he was damaged because he would have made more money had he remained with Fortinet.

**DISCUSSION**

Tanium now moves for summary judgment as to Plaintiff's sole cause of action: fraud. Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Because

1  Plaintiff fails to provide any evidence Defendant knew its representation was false (or made the

2  representation recklessly), the Court GRANTS Defendant's motion for summary judgment.

3  **I.    Plaintiff's Fraud Claim**

4  Plaintiff alleges the following offer, from James Evans, forms the basis for his fraud claim:

> [Evans] said, "30,000 share of stock vesting over four years. **Stock has a current fair market value of $5 a share**. 30,000 times five equals $150,000 current value subject to vesting."

7  (Dkt. No. 45-2 at 50) (emphasis added).  Had Plaintiff known the 409A value of $2.01 per share in

8  March 2016, he asserts he would not have accepted Tanium's job offer.  And, had Plaintiff

9  remained at Fortinet instead of joining Tanium, Plaintiff claims he would have made more money

10  than he made at Tanium.

11  To establish a claim for deceit based on intentional misrepresentation, Plaintiff must prove:

> (1) the defendant represented to the plaintiff that an important fact was true; (2) that representation was false; (3) the defendant knew that the representation was false when the defendant made it, or the defendant made the representation recklessly and without regard for its truth; (4) the defendant intended that the plaintiff rely on the representation; (5) the plaintiff reasonably relied on the representation; (6) the plaintiff was harmed; and (7) the plaintiff's reliance on the defendant's representation was a substantial factor in causing that harm to the plaintiff.

17  *Manderville v. PCG&S Grp., Inc.*, 146 Cal. App. 4th 1486, 1498 (2007); *See also CACI 1900*.

18  The Court addresses each element in turn.

19  **A.    Factual Representation or Opinion?**

20  There is evidence in the record that Evans told Plaintiff the RSUs were worth $5 per share

21  in March 2016.  (*See* Dkt. No. 44-13 at 7 n.1.)  The parties dispute, however, whether such a

22  statement is actionable as fraudulent misrepresentation.  Defendant argues Evans' statement of

23  "current market value" was opinion, not "fact."

24  Statements of value are typically considered "opinion," not fact. *See Kahn v. Lischner*, 128

25  Cal. App. 2d 480, 487 (1954).  But there are exceptions to this general rule.  For example, "if the

26  opinion is rendered under circumstances such that it may be regarded as amounting to a positive

27  affirmation of fact, it will be treated as a representation of fact for purposes of a deceit action."

28  *Neu-Visions Sports, Inc. v. Soren/McAdam/Bartells*, 86 Cal. App. 4th 303, 307 (2000) (cleaned

1  up). Moreover, "when a party possesses or holds itself out as possessing superior knowledge or
2  special information or expertise regarding the subject matter and a plaintiff is so situated that it
3  may reasonably rely on such supposed knowledge, information, or expertise, the defendant's
4  representation may be treated as one of material fact." *Id.* Thus, "the line between opinion and
5  fact is not a distinct one." *Id.*

6  A jury could find Evans' valuation statement was a factual representation. Evans
7  represented the $5.00 per share price as a *current* valuation, not a prediction of future value.
8  *Brakke v. Econ. Concepts, Inc.*, 213 Cal. App. 4th 761, 769 (2013) ("[A] misrepresentation must
9  be of an existing fact, not an opinion or prediction of future events.") Moreover, the parties held
10 unequal access to valuation information. While valuation statements are typically considered
11 opinions, that general rule holds particular force when "an opportunity is present to ascertain the
12 real value." *Kahn*, 128 Cal. App. 2d at 487. Tanium was a private, closely held corporation.
13 Thus, Plaintiff had no ability to validate Evans' representation from a public market or alternative
14 bidder. *See S. Cal. Etc. Assembles of God v. Shepherd of Hills etc. Church*, 77 Cal. App. 3d 951,
15 960 (1978) (finding statements actionable when relevant information was "*peculiarly within*
16 *defendants' knowledge*.") (emphasis added).

17 The evidence Evans' multiplied the 30,000 RSU offer by the share price supports this
18 finding. An opinion may also be actionable when "a party states his opinion as an existing fact or
19 as implying facts which justify a belief in the truth of the opinion." *Brakke*, 213 Cal. App. 4th at
20 769. Here, a reasonable jury could find Evans presented his opinion as an existing fact when he
21 multiplied the share price by the number of Plaintiff's RSUs to reach the $150,000 offer as a
22 comparison to Plaintiff's $90,000 unvested equity interest at Fortinet. *See also Willson v. Mun.*
23 *Bond Co.*, 7 Cal. 2d 144 (1936) (finding representation bonds were worth 100 cents-on-the-dollar,
24 coupled with statement that a bank would loan money based on the bonds, could serve as basis for
25 fraud claim).

26 Defendant argues Plaintiff was highly educated and neither Tanium nor Evans held
27 themselves out as specially qualified as to Tanium's stock value. This argument is unpersuasive.
28 While Plaintiff's education is relevant to whether his reliance was reasonable, *see* Part I.E.2 *infra*,

7

1   his background does not affect the fact versus opinion analysis. Evans' particular qualifications
2   are similarly irrelevant. Evans represented access to "special information," not special expertise.
3   *Neu-Visions Sports*, 86 Cal. App. 4th at 307. Evans did not explain the basis for his opinion, nor
4   did he specify the value was based on the last transaction price. So, as explained above, a
5   reasonable juror could find Evans represented access to non-public valuation information when he
6   stated the "current market value" of Tanium—a private, illiquid company—while presenting
7   Plaintiff with the offer.

8       In sum, the Court cannot say Evans' statement was "opinion" as a matter of law because he
9   stated a "current" value, the parties had unequal access to information, and Evans' calculation
10  (30,000 multiplied by $5.00 a share) could raise an inference the representation was factual. So,
11  taking all disputed factual inferences in Plaintiff's favor, a reasonable juror could decide
12  Defendant made a statement of fact to Plaintiff that the share value was $5.00 in March 2016. *See*
13  *Willson*, 7 Cal. 2d at 151 ("The cases also indicate that where there is a reasonable doubt as to
14  whether a particular statement is an expression of opinion or the affirmation of a fact, the
15  determination rests with the trier of the facts.")

16  **B.  Misrepresentation**

17      Defendant claims Evans' statement—"Stock has a current fair market value of $5 a share"
18  was true as a matter of law because the most recent stock sale to investors valued shares at $15 per
19  share, Tanium subsequently performed a 3-for-1 stock split, and $15 per share divided by three
20  equals $5 per share. (Dkt. No. 46 at 6.) Plaintiff claims Evans' statement was false (or at least
21  misleading) because the 409A value, which Grant Thornton assessed after the $5 per share sale but
22  prior to Evans' statement, pegged the stock at $2.01 per share. (Dkt. No. 45 at 11.) And Tanium
23  never disclosed the 409A value when providing the job offer. (*Id.* at 12.)

24      This is a disputed question of material fact. The "false statement" standard covers
25  statements beyond outright lies:

26  > A representation need not be a *direct falsehood* to constitute fraud. It
27  > may be a deceptive answer or other indirect but misleading language.
    > []. Though one may be under no duty to speak as to a matter, if he
    > undertakes to do so, either voluntarily or in response to inquiries, he
28  > is bound not only to state truly what he tells, but also not to express

> or conceal any facts within his knowledge which materially qualify those stated. If he speaks at all he must make a full and fair disclosure.

*Brady v. Carman*, 179 Cal. App. 2d 63, 68 (1960) (cleaned up) (emphasis in original). Here, taking all inferences in Plaintiff's favor, a reasonable juror could find Defendant inaccurately stated the stock price in March 2016. For example, the Grant Thornton report states "[Tanium] plans to use this report solely for the purpose of granted employee stock reports," Grant Thornton provided "valuation services," and December 31, 2015 is referred to as the "Valuation Date" in the report. (Dkt. No. 45-9 at 1.) As Defendant acknowledges in its brief, the 409A value is calculated for tax liability. Thus, if the grant was 30,000 stock options rather than RSUs, the 409A value would represent—for tax purposes—the value of the shares he received on the day he received them. Put differently, if the grant were options rather than RSUs, Plaintiff would have to pay the 409A value to secure the option to sell the shares and would realize only the gain between the eventual sale price and the 409A value. Taking all inferences in Plaintiff's favor, a reasonable jury could find the $5.00 per share price was not the value of the RSUs at the time of the grant because the Grant Thornton Report presents a different valuation.

Defendant's counterarguments are unpersuasive. First, Defendant argues Plaintiff provides no evidence that the fair market value of Tanium was not $5.00 per share in March 2016. (Dkt. No. 46 at 6.) But, absent any expert testimony explaining the difference between a 409A value and "fair market value," a reasonable juror could view Evans' valuation with skepticism given the Grant Thornton report because the Grant Thornton report calls the valuation the "fair value" of common shares. (Dkt. No. 45-9 at 1.) Second, Defendant argues the last transaction price is the correct fair market value as a matter of law, notwithstanding the 409A value, because 409A valuations are *only* calculated for the purposes of tax liability. But again, Defendant fails to provide evidence or authority that a valuation for tax purposes is different than a fair market value as a matter of law. Rather, Defendant argues: "As a private closely held company that does not trade its stock on the public market, it is completely reasonable for Tanium to look to private investor sales, rather than a Section 409A valuation, as a basis for the true value of its stock." (*Id.*) Drawing all inferences in Tanium's favor, a jury might agree. But that argument speaks more to Tanium's good faith basis supporting Evans' representation, rather than the truth or falsity of his

representation.

At bottom, Defendant cites no authority supporting the proposition that the last transaction price is "true value" as a matter of law, where an intervening assessment (which, admittedly, relied on different considerations) assessed a different value for tax purposes.[2] Thus, disputes remain regarding whether Evans' representation was accurate.

### C. Tanium's Knowledge

Plaintiff must also prove Tanium *knew* the representation was false when Tanium made it, or Tanium made the representation recklessly *and without regard for its truth*. *Manderville*, 146 Cal. App. 4th at 1498. Defendant argues Tanium lacked the requisite "knowledge" because Evans did not know about the 409A value and, in any event, Tanium had a good faith belief the last transaction price was an accurate assessment of fair market value. (Dkt. No. 44-13 at 17.) The Court agrees. Plaintiff's opposition glosses over the "knowledge" requirement and focuses only on Tanium's intent to induce reliance. (Dkt. No. 45 at 18.) But knowledge of falsity is a separate element from intent for fraud claims under California law. *See* 1 CACI § 1900 (2023). No reasonable trier of fact could find Tanium knew its $5 representation as to the value of shares was false.

First, it is undisputed Evans—the only person who made the representation to Plaintiff—had no knowledge of the 409A value when he represented the $5.00 price to Plaintiff. (Dkt. No. 44-16 ¶ 3.) As Plaintiff's falsity argument turns *solely* on the existence of the 409A report, it follows that Evans could not have known the $5.00 value was false. Instead, he testified that when talking to recruits he would talk about value of shares in the private company in "terms of the last equity event. Like, what did the investor pay as they . . . took a stake in Tanium." (Dkt. No. 45-4 at 21.) There is no evidence to dispute Tanium's evidence that the last equity event suggested a value of $5 per share.

---

[2] California courts have called this valuation question a "difficult legal problem." *In re Marriage of Hewitson*, 142 Cal. App. 3d 874 (Ct. App. 1983)(describing two methods of calculating fair market value for closely held shares as: (1) recent sales of the unlisted stock, which were made in good faith and at arm's length, within a reasonable period either before or after the valuation date; and (2) the price-earnings ratio method to determine fair market value for federal tax purposes).

10

Plaintiff argues Evans was a "managing agent," but he cites no case holding an employer liable for representations made by an employee when the employee thought the representations were accurate. To put it another way, assuming, without deciding, Evans was a "managing agent," he does not cite any caselaw suggesting a corporation can be found liable for fraud if a managing agent makes a statement he believes is true, but a different managing agent possesses knowledge the statement is not true. In most cases finding fraudulent inducement the employer's agent knew the representation was false when the representation was made. *See*, *e.g.*, *Lazar v. Superior Ct.*, 12 Cal. 4th 631, 636 (1996) ("[W]hen making [the representations], [the defendant's] agents knew they were false.")

Second, to hold Tanium liable for fraud—an intentional tort—when Evans had no reason to believe he was making a misrepresentation would take something more significant, such as evidence Tanium knew the $5.00 share value was false and communicated that value to its hiring managers anyway. But no evidence exists that supports a finding Tanium thought the $5.00 per share value was false or misleading when Evans communicated that number to Plaintiff. Some employees at Tanium did know about the Grant Thornton report. But the mere existence of the report does not support an inference "Tanium" knew the price based upon the last equity event was false. Plaintiff offers no evidence that using the last equity price is improper when valuing shares of private companies, and no evidence that any company ever uses the 409A report to value a company's shares for prospective employees or investors.

Third, the only record evidence addressing why Tanium used the last equity event price rather than the 409A report, evidence which stems from events after Tanium hired Plaintiff, supports the contrary inference: Tanium's management team thought the $5.00 value was *more accurate* as a fair market value for prospective employees than the 409A value because $5.00 represented what a buyer had actually paid for the shares. (Dkt. No. 45-11 at 17.) For example, Villalobos testified to a conversation with an employee candidate, in which the candidate raised the 409A value and Tanium told the candidate that was an inaccurate value and, indeed, that shares had been purchased through a buyback for more than the 409A valuation. (*Id.* at 18.) She also testified management told her to share with prospective employees that share value was based

upon the last equity event. (*Id.* at 11.) So, all available evidence supports the inference Tanium had good reason to believe market value should not be tied to 409A value and instead to the last equity event.

Plaintiff's insistence Tanium had a duty to disclose the 409A value to Plaintiff and thus its failure to do so supports an inference of knowledge is unpersuasive. Plaintiff cites no evidence or law that Tanium was under a special fiduciary duty to disclose all information during the employment negotiations. *See* 1 CACI 1901 (2023) (discussing fiduciary duty). And, even if a duty to disclose material facts arose outside of a fiduciary relationship, no evidence supports an inference Tanium or Evans intentionally *concealed* a material fact. *See Roddenberry v. Roddenberry*, 44 Cal. App. 4th 634, 666 (1996) (finding the defendant "concealed the true facts in the hope that the first Mrs. Roddenberry would accept . . . payments and never discover she was receiving only a third.") Failure to provide every piece of information regarding a company's operations is not the same as *intentionally concealing* a material fact to induce reliance.

In sum, no evidence supports Plaintiff's theory Tanium knew the $5.00 value was incorrect or misleading, and no evidence supports Plaintiff's theory Defendant communicated the $5.00 value recklessly. To the contrary, all available evidence supports Defendant's representation that Tanium communicated the $5.00 price because Tanium thought the price was accurate.[3] Because Plaintiff fails to provide sufficient evidence supporting an inference Tanium *knew* the $5.00 share price was inaccurate (or communicated the share price to Evans with reckless disregard for the truth), Plaintiff's fraud claim fails as a matter of law.

### D.  Tanium's Intent

A reasonable jury could find Defendant intended Plaintiff rely on the representation when making his employment decision. To prove fraud, Plaintiff must show Defendant intended Plaintiff to take an action (to his own risk) based on the misrepresentation. *See Gagne v. Bertran*,

---

[3] At the hearing, Plaintiff's counsel argued the $5.00 per share price negotiated in August 2015 represented a different form of stock than the common stock Plaintiff was offered. But the record only states private investors paid $15.00 share before the 3-for-1 split. (Dkt. No. 44-14 ¶ 3.) Curren's declaration says "As a result of this stock split, each share of Tanium was valued at $5.00 per share." (*Id.*) Plaintiff provides no evidence that sale referred to a different form of stock.

43 Cal. 2d 481, 488 (1954) (collecting cases).

Defendant argues it intended Plaintiff rely on the valuation to induce his future employment at Tanium, not to induce Plaintiff to leave Fortinet. But that argument rests on a distinction without a difference. To take the Tanium offer was to forgo the Fortinet job. Indeed, Plaintiff informed Defendant he wanted to make "more" than he made at Fortinet. And he told Defendant what he made at Fortinet. So, a reasonable juror could find Defendant represented the RSU value in order to present a compensation package that exceeded Plaintiff's package at Fortinet. Put differently, a reasonable juror could find Defendant intended Plaintiff to change jobs, not just to accept the Tanium job. *See Lovejoy v. AT & T Corp.*, 92 Cal.App.4th 85, 93–94 (2001) ("[T]he only intent by a defendant necessary to prove a case of fraud is the intent to induce reliance. Moreover, liability is affixed not only where the plaintiff's reliance is intended by the defendant but also where it is reasonably expected to occur.") Thus, Defendant's argument on this prong also fails.

### E. Causation

The final elements of fraud require Plaintiff (1) actually relied on the misrepresentation, (2) the reliance was justifiable, and (3) Plaintiff's justifiable reliance caused Plaintiff harm. *Beckwith v. Dahl*, 205 Cal. App. 4th 1039, 1062 (2012). Because material factual disputes remain, the Court cannot determine Plaintiff did not suffer detrimental reliance.

#### 1. Actual Reliance

"Actual reliance occurs when a misrepresentation is an immediate cause of [a plaintiff's] conduct, which alters his legal relations and when, absent such representation, the plaintiff would not, in all reasonable probability, have entered into the contract or other transaction." *Id.* at 1062-63. Plaintiff testified he accepted the job with Fortinet in large part because "150 is more than 90." That statement raises a genuine dispute as to Plaintiff's actual reliance.

#### 2. Justifiable Reliance

In addition to actual reliance, Plaintiff must also set "forth facts to show that his or her actual reliance on the representations was justifiable, so that the cause of the damage was the defendant's wrong and not the plaintiff's fault." *Beckwith v. Dahl*, 205 Cal. App. 4th 1039, 1066

13

(2012). "Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact." *All. Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226, 1239 (1995)

Defendant argues Plaintiff's reliance was unjustified as a matter of law, (Dkt. No. 46 at 11-14), and analogizes this case to *Hinesley v. Oakshade Town Center*, 135 Cal. App. 4th 289 (2005). There, the California Court of Appeals affirmed summary judgment against the plaintiff because the plaintiff failed to show reasonable reliance on the defendant's representation. The plaintiff claimed he signed a lease agreement because the defendant represented three restaurant chains would commence tenancy in the same shopping center within a year. *Id.* at 292. But the lease agreement stated: "Lessee does not rely on the fact nor does Lessor represent that any specific Lessee of [sic] type or number of Lessees shall during the term of this Lease occupy any space in the shopping center." *Id.* at 300. According to the California Court of Appeals, this language "waved a red flag, or at least a yellow flag" in front of the plaintiff. *Id.* at 302. The plaintiff admitted he had reviewed that provision; after reviewing the lease with a lawyer, the plaintiff requested changes to the agreement but never challenged that provision, and the plaintiff never asked other potential tenants about alleged lease agreements. *Id.* at 291-292. Thus, the court affirmed based on "complete absence of any actions taken to question, clarify, or confirm the contractual status" of other co-tenants in a shopping center. *Id.* at 303. *See also Orozco v. WPV San Jose, LLC*, 36 Cal. App. 5th 375, 393 (2019) (denying summary judgment where the plaintiff asked clarifying questions regarding other tenants under similar circumstances to those in *Hinesley*).

Despite some factual similarities between *Hinesley* and this matter, reasonable minds could come to more than one conclusion here. As Defendant notes, Plaintiff had legal knowledge; Plaintiff had industry experience with equity compensation; Plaintiff did not ask human resources to confirm the RSU value; and Plaintiff waited five years to raise the issue with Tanium. But, unlike in *Hinesley*, the contractual disclaimer here does not precisely cover the alleged misrepresentation. There, the defendant represented certain business would sign leases and then disclaimed representations regarding future co-tenants in the contract. Here, Plaintiff complains

14

1  Defendant misrepresented *current* RSU value in March 2016; but Defendant cites a provision in
2  the RSU agreements requiring Plaintiff to acknowledge "the *future* value of the underlying Shares
3  is unknown, indeterminable and cannot be predicted." (Dkt. No. 44-5 at 8.) (emphasis added). The
4  contract does not disclaim any representation as to the current value. The current value and the
5  future value are separate issues. A disclaimer as to the latter, does not give rise to a "red flag" as to
6  the former.[4] Thus, *Hinesley* carries little force because its critical fact—the scope of the
7  disclaimer—does not apply here.

8  In sum, this is not the rare case where the undisputed facts leave no room for a reasonable
9  difference of opinion. *Rothwell*, 10 Cal. 4th at 1239. Because a jury could rule in Plaintiff's
10 favor, Defendant's motion for summary judgment on this prong fails.

### 3. Resulting Harm

"Misrepresentation, even maliciously committed, does not support a cause of action unless the plaintiff suffered consequential damages." *Beckwith*, 205 Cal. App. 4th 1064. In California, damages must be proven with "reasonable certainty" in both contract and tort actions. *See Vestar Dev. II, LLC v. General Dynamics Corp.,* 249 F.3d 958, 961 (9th Cir.2001) (contract action); *Mann v. Jackson,* 141 Cal.App.2d 6, 296 P.2d 120, 123 (1956) ("It is well established that damages may be awarded for loss of profits where such profits can be shown with a reasonable degree of certainty, whether the action be for tort or for breach of contract.").

The parties dispute the form of damages available here. California Civil Code § 1709 states: "One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." Separately, § 3333 provides:

> For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not.

---

[4] The RSU agreement also stated: "The Plan, the Notice of Grant and this Agreement constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements." (Dkt. No. 44-5 at 6.) But that provision is even less explicit than the provision disclaiming future value. Such a clause, alone, does not prohibit allegations of fraudulent inducement to contract. *See, e.g., Airs Int'l, Inc. v. Perfect Scents Distribs., Ltd.,* 902 F.Supp. 1141, 1147 (N.D. Cal. 1995) (merger clause does not preclude evidence of fraudulent inducement).

15

Cal. Civ. Code § 3333.

Two traditional measures of damages emerged from these statutes: out-of-pocket damages and benefit-of-the-bargain damages. *See City Sols., Inc. v. Clear Channel Commc'ns, Inc.*, 242 F. Supp. 2d 720, 726 (N.D. Cal. 2003) (reviewing the history of damages for fraud in California), *aff'd in part, rev'd in part on other grounds*, 365 F.3d 835 (9th Cir. 2004). Out-of-pocket damages restore a plaintiff to the financial position he or she enjoyed prior to the fraudulent transaction—awarding the difference between what the plaintiff gave and what the plaintiff received. *Fragale v. Faulkner*, 110 Cal. App. 4th 229, 236 (2003). The benefit-of-the-bargain measure places a defrauded plaintiff in the position he or she would have enjoyed had the false representation been true—awarding the difference in value between what the plaintiff actually received and what the plaintiff was fraudulently led to believe he or she would receive. *Id.*

California courts have also recognized damages for lost income opportunities in employment scenarios. *See Lazar v. Superior Ct.*, 12 Cal. 4th 631, 646 (1996). But courts have been unclear as to whether lost income damages are a form of out-of-pocket damages, a form of benefit of the bargain damages, or some third category—such as lost profits—beyond those standard definitions. *Compare Lazar*, 12 Cal. 4th at 648-649 *with Helmer v. Bingham Toyota Isuzu*, 129 Cal. App. 4th 1121, 1130 (2005). *See also Clear Channel Commc'ns, Inc.*, 242 F. Supp. 2d at 724-734 (discussing lost profit damages as different from other damage categories).

This case fits uncomfortably in the traditional damages scheme under California law. Defendant asserts Plaintiff suffered no damages here because it is undisputed the RSUs are currently worth *more* than $5.00 a share. So, benefit of the bargain damages do not apply here because Plaintiff received the benefit-of-the-bargain (and more). The Court agrees. Plaintiff cannot recover benefit-of-the-bargain damages. But Plaintiff's alleged damage is not that he got anything less than he expected to receive when the vesting period ended. Rather, his alleged damage stems from Fortinet's stock appreciating *more* than Tanium's did. But for the representation of $5.00 per share as of March 2016, Plaintiff claims he would have stayed at

16

Fortinet and made more money than he made at Tanium.[5]

This theory does not fit squarely as traditional out-of-pocket damages either. "The 'out-of-pocket' measure of damages is directed to restoring the plaintiff to the financial position enjoyed by him prior to the fraudulent transaction, and thus awards *the difference in actual value at the time of the transaction* between what the plaintiff gave and what he received." *All. Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226, 1240 (1995) (emphasis added). Here, Plaintiff gave up his salary at Fortinet, his unvested options, and the opportunity to participate in the ESPP. Taking just the unvested options as an example, the evidence shows the Fortinet RSUs were worth roughly $90,000 *at the time of the transaction*. So, Plaintiff gave up $90,000 worth of unvested RSUs (at the time of the transaction) for roughly $60,000 worth of unvested RSUs at Tanium, (assuming, for the purposes of argument, the $2.01 409A price was correct valuation in March 2016). Again, Plaintiff's profit on his Tanium stock far outstrips the roughly $30,000 difference between those two values (as of 2016).

Plaintiff seems to request a different version of damages: lost potential income had the representation not been made. Plaintiff wants the value of his Fortinet RSUs and anticipated compensation at Fortinet *as of when he quit Tanium*, less what he made at Tanium. In a sense, Plaintiff wants an expansive form of "out-of-pocket" damages in which "the actual value" of what Plaintiff forwent is timestamped as of his last day at Tanium, rather than his first. Or, put differently, Plaintiff wants damages for the road not taken due to Tanium's alleged misrepresentation.

Two cases are instructive here. In *Lazar v. Superior Court*, the defendant induced the plaintiff to leave stable employment in New York for a job in Los Angeles. 12 Cal. 4th at 469. But, despite giving assurances of secure employment, the defendant fired the plaintiff shortly

---

[5] Plaintiff cites only his own deposition testimony as evidence of harm. He testified: "If I would have stayed at Fortinet, I was a director of technical documentation at Fortinet where I received annual increases in salary, bonus, stock, participation in ESPP, and that would have been a lot more money than I made at Tanium." (Dkt. No. 45-2 at 113). He estimated the differences was $1.4 million, based on the RSUs given up, future anticipated RSU grants, and participation in ESPP. (*Id.* at 115-116.)

thereafter. *Id.* The plaintiff was able to prove the defendant always intended to fire plaintiff and presented evidence he was unable to re-obtain employment in New York. Thus, the California Supreme Court held:

> [A]s to his fraud claim Lazar may properly seek damages for the costs of uprooting his family, expenses incurred in relocation, and the loss of security and income associated with his former employment in New York. On the facts as pled, however, Lazar must rely on his contract claim for recovery of any loss of income allegedly caused by wrongful termination of his employment with [the defendant].
>
> Lazar, therefore, may proceed with his claim for fraud in the inducement of employment contract, properly seeking damages for "all the detriment proximately caused thereby" (Civ. Code, § 3333), as well as appropriate exemplary damages (Civ. Code, § 3294).

*Id.* In a sense, *Lazar* recognizes an expansive version of out-of-pocket damages. The plaintiff gave up future steady income in New York and uprooted his family based on a representation he would have steady employment in Los Angeles. That representation was not true. For his fraud cause of action, the plaintiff could receive what he gave up in New York (including the future anticipated income from the job forsaken). But his fraud claim did *not* cover recovery of the income he lost from the defendant because the representation was untrue (benefit-of-the-bargain damages). Rather, his breach of contract claim covered that remedy.

*Helmer v. Bingham Toyota Isuzu* addressed similar circumstances but discusses the damages as the benefit-of-the-bargain struck. 129 Cal. App. 4th at 1130. There, the defendant promised a prospective employee a higher income than he received at his current, stable job. *Id.* at 1124. When the prospective employee joined the defendant's company, however, he received less money than he was promised and he was unable to return to his old position. *Id.* at 1125. The Court of Appeals held the plaintiff's lost future income (had he remained at his original job) was compensable as part of the "benefit of the bargain." *Id.* at 1130. The Court wrote:

> Here, the employer made a false promise to induce an act by an employee who otherwise would have stayed in his former job. The employer "bargained" to obtain an employee who already had steady employment with another company. It is only fair to compensate the employee for the damages he suffered as a result of leaving that steady employment.

*Id.*

18

The former approach, espoused in *Lazar*, is on point here. What Plaintiff seeks is not the benefit-of-the-bargain struck. Rather, Plaintiff seeks to be placed in the position he would have occupied had the alleged misrepresentation never occurred. Just as Lazar sought the income associated with his forgone New York employment, Plaintiff seeks the income associated with his Fortinet employment that he allegedly forwent because of Defendant's representation. Defendant argues this damages theory could open the flood-gates to litigation when employees regret switching employers and—despite making money—make less than they might have otherwise made. That fear is not unreasonable. But the other elements of fraudulent inducement—such as knowledge of falsity, intent, and reliance—protect against this slippery slope.

Statutory interpretation supports this approach. Under California Civil Code § 3333, Plaintiff can seek "the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." So, "[i]n a fraud case, we must always return to the key question—how did the victim actually rely to its detriment on the false promise. Or, put differently, how would the outcome have differed had the false promise not been made or relied upon." *Clear Channel Commc'ns, Inc.*, 242 F. Supp. 2d at 732. Here, Plaintiff presents evidence (via his own testimony) that he would have made $1.4 million more had Defendant told him the 409A value. That is damage. Thus, Defendant's motion for summary judgment on this prong fails as well.

## CONCLUSION

Disputed questions of material fact remain as to the nature of Defendant's representation, whether the representation was deceptive, whether Defendant intended Plaintiff rely on the representation, and whether Plaintiff reasonably relied on that representation to his detriment. But because Plaintiff fails to establish any evidence Defendant had knowledge Evans' representation was false (or allowed Evans to proceed with reckless disregard for the truth), Plaintiff's fraud claim fails as a matter of law. Defendant's summary judgment motion is GRANTED.

//

//

//

**IT IS SO ORDERED.**

This Order disposes of Dkt. No. 44

Dated: February 17, 2023

                                                                JACQUELINE SCOTT CORLEY
                                                                United States District Judge