1

2

3

4                    UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7   DANIEL HOWARD,                        Case No.  21-cv-09703-JSC

                      Plaintiff,
8
                                          **ORDER RE: DAUBERT MOTIONS**
9         v.
                                          Re: Dkt. Nos. 104-107
10  TANIUM, INC.,

                      Defendant.
11

12

13         Daniel Howard filed suit against his former employer, Tanium Inc., alleging Tanium

14  fraudulently induced him to join Tanium as an employee.  Jury trial is scheduled to commence

15  July 15, 2025.  Now pending before the Court are four motions to exclude expert testimony under

16  Federal Rule of Evidence 702.  Having carefully reviewed the parties' submissions, and with the

17  benefit of oral argument on June 25, 2025, the Court GRANTS Tanium's motion to exclude

18  Phillip Allman's report and GRANTS in part Tanium's motions to exclude Jennifer Cohen's

19  report and Marcia Wagner's rebuttal report.  In addition, the Court GRANTS in part Plaintiff's

20  motion to exclude Neil Beaton's report and rebuttal report.

21                              **BACKGROUND**

22         The Court's summary judgment order details the facts in this case.  (Dkt. No. 48.)  Briefly,

23  relevant to the parties' motions to exclude, Plaintiff worked at Fortinet, a publicly traded

24  technology company, from 2014 to 2016.  (*Id.* at 1.)  In March 2016, Plaintiff applied for a

25  technical writer position at Tanium, a private, closely held corporation.  (*Id.* at 2.)  James Evan, an

26  Engineering Manager at Tanium, extended an offer to Plaintiff via telephone.  Evans offered a

27  $165,000 salary plus bonuses and "30,000 shares of stock vesting over four years."  (*Id.*)

28  According to Plaintiff, Evans said "Stock has a current fair market value of $5 a share.  30,000

United States District Court
Northern District of California

1    times five equals $150,000 current value subject to vesting." (*Id.*)  Evans does not remember the

2    terms of his offer to Plaintiff.  (*Id.* at 3.)

3        Tanium subsequently sent Plaintiff an offer letter listing a $165,000 salary, a grant of

4    30,000 Restricted Stock Units ("RSUs") vesting over four years, and a 25% bonus.  (*Id.*)  The

5    letter did not include a valuation for the 30,000 RSUs.  (*Id.*)  Plaintiff signed Tanium's offer letter

6    and RSU agreement.  (*Id.* at 5.)  In 2020, shortly after his initial grant of 30,000 RSUs fully

7    vested, Plaintiff quit Tanium.  (*Id.*)

8        In November 2021, Plaintiff sued Tanium for fraud, alleging Tanium misrepresented the

9    value of its stock to induce him to leave Fortinet and work for Tanium.  (Dkt. No. 1-2 at 4-5.)

10   Tanium executives claim the $5 per share valuation was based on an August 2015 stock sale

11   event.  (*Id.*)  There, private investors purchased Tanium shares for approximately $15 per share,

12   after which Tanium split its shares on a 3-to-1 basis, which provided shareholders with 3 shares

13   for every 1 share they held.  (*Id.*)  Plaintiff asserts the fair value of the RSUs at the time of the job

14   offer was $2.01 per share based on an independent valuation conducted by Grant Thornton LLP

15   entitled "Re: Valuation Services in Connection with IRC Section 409A and Fair Value

16   Reporting."  (*Id.* at 4.)  The Grant Thornton Report stated the "Common Stock" for Tanium was

17   valued at $2.01 as of December 31, 2015.  (*Id.*)

## DISCUSSION

19       Now pending before the Court are four motions to exclude under Federal Rule of Evidence

20   702.  Tanium moves to exclude the reports of Jennifer Cohen and Phillip Alman and the rebuttal

21   report of Marcia Wagner.  (Dkt. Nos. 105-107.)  Plaintiff moves to exclude Neil Beaton's report

22   and rebuttal report.  (Dkt. No. 104.)

23       Federal Rule of Evidence 702 permits admission of an expert's testimony when:

> (a) the expert's scientific, technical, or other specialized knowledge
> will help the trier of fact to understand the evidence or to determine a
> fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods;
> and
> (d) the expert's opinion reflects a reliable application of the principles
> and methods to the facts of the case.

United States District Court
Northern District of California

Fed. R. Evid. 702.  Rule 702 imposes upon district courts a "'gatekeeping' obligation" to ensure that expert testimony "is not only relevant, but reliable."  *United States v. Hankey*, 203 F.3d 1160, 1167 (9th Cir. 2000) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)).  The burden of proving admissibility rests with the proponent of the expert testimony.  *Lust By & Through Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).  In 2023, Rule 702 was amended to "clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule."  Fed. R. Evid. 702 (Advisory Committee Notes, 2023 Amendments).  "[T]he trial court has substantial discretion in discharging its gatekeeping obligation."  *Hankey*, 203 F.3d at 1167.

## I.    JENNIFER COHEN

### A.    Report

Jennifer Cohen, a Charter Financial Analyst ("CFA"), is a partner at Citrin Cooperman Advisors LLC, an accounting and consulting firm that "provides business, economic, financial, and valuation consulting services to clients in a variety of industries."  (Dkt. No. 101-3 at 5.)  Her report expresses her opinions "regarding the use of 409A valuations in determining the value of certain classes of stock."  (*Id.* at 9.)

The report's Analysis section has two parts.  Part A, titled "409A Valuations," discusses the "distinct characteristics" of Tanium's preferred and common stock according to Tanium's certificate of incorporation.  (*Id.* at 10-14.)  Specifically, the report describes what holders of Tanium preferred and common stock are entitled to regarding dividends, liquidation preference and seniority, redeemability provisions (call and put rights), voting rights, and equity participation and convertibility.  Part B, titled "Representations by Tanium," states Tanium represented to Plaintiff the fair market value of Class B Common Stock was $5 per share; however, that $5 figure "represents the fair value of Preferred Stock."  (*Id.* at 107.)  Because "the value of the Preferred Stock would be higher than the value of the Common Stock[,] . . . Tanium inappropriately and inaccurately represented the value of Plaintiff's stock compensation."  (*Id.*)  In the conclusion section, Ms. Cohen states "[b]ased on the information provided, I find the value of stock

compensation received by Mr. Howard to be $2.01 per share." (*Id.*)

### B.    Analysis

Tanium moves to exclude Ms. Cohen's testimony on multiple grounds.  Tanium asserts "Ms. Cohen giving a blind 'thumbs up' to the 409A Valuation will not help the jury understand the evidence or determine a fact at issue." (Dkt. No. 101-4 at 12.)  Relatedly, Tanium argues "Ms. Cohen did not rely on sufficient facts or data in coming to her conclusion" and "does not provide any method through which she came to her conclusion." (*Id.*)

The Court grants in part Tanium's motion to exclude Ms. Cohen's report.  In Part A of the report—where Ms. Cohen describes terms of Tanium's preferred and common stock—Ms. Cohen uses her skill, experience, and education to explain Tanium's certificates of incorporation in a way that will likely help jurors.  Tanium does not object to this testimony.  So, Ms. Cohen may testify as to Part A of the report.  She may also testify to her conclusion that Tanium's preferred stock has "some favorable rights" in comparison to its common stock, so "the value of the Preferred Stock would be higher than the value of the Common Stock." (Dkt. No. 101-3 at 14.)

But Ms. Cohen may not testify that $5 per share represents the fair value of Tanium's preferred stock, that $2.01 represents the value of the common stock Mr. Howard received, or that Tanium inappropriately and inaccurately represented the value of Plaintiff's stock compensation because Plaintiff has not established these opinions are more likely than not the product of reliable principles and methods.  Regarding Ms. Cohen's determination that $5 per share represents Tanium's preferred stock, Ms. Cohen cites only the declaration of Mike Curran at Docket No. 44-14 for this point, in which Mr. Curran describes Tanium's stock split.  The declaration says nothing about common versus preferred stock.

Regarding her conclusion "the value of stock compensation received by Mr. Howard [is] $2.01 per share," (Dkt. No. 101-3 at 14), Ms. Cohen testified she did not do any independent analysis to arrive at the $2.01 value:

> Q:  Okay. What analysis did you do to determine the fair market value
> of the RSU grants – I'm sorry, the RSU on the date of the grant?
> A:  I did not do an analysis of that.
> Q:  So what did you do to arrive at the $2.01 value?
> A:  I relied on the Grant Thornton Valuation Report.

United States District Court
Northern District of California

> Q:  But you did no independent analysis; is that correct?
> A:  I did not have the complete report. I only had one page of the
> cover letter, which stated the conclusion.
> Q:  So that's not quite what I asked you. I asked you if you did any
> independent analysis beyond looking at the Grant Thornton report.
> A:  I didn't -- I did not.

(Dkt. No. 101-4 at 138-139.)  She later reiterated this testimony:

> Q:  So, then this $2.01 per share is based solely on the Grant Thornton
> valuation?
> [Objection]: Asked and answered.
> THE WITNESS: Yes.

(*Id.* at 145.)  Because Ms. Cohen admits she did not do any independent analysis to arrive at the $2.01 figure, her opinion as to this valuation is unreliable.  And because her conclusion Tanium "inappropriately and inaccurately represented the value of Mr. Howard's stock" is based on her conclusion about the value per share, that conclusion is also unreliable.  Moreover, whether Tanium accurately represented the value of its stock is for the jury to decide.

Plaintiff argues "Tanium misrepresents Cohen's opinion," asserting Ms. Cohen never opined that the value of the stock was $2.01 but "merely accepted that number as consistent with what Tanium had reported in other circumstances."  (Dkt. No. 101-3 at 92.)  Plaintiff's argument overlooks the conclusion section, where Ms. Cohen states "I find the value of stock compensation received by Mr. Howard to be $2.01 per share."  (Dkt. No. 101-3 at 14.)

Plaintiff also argues Tanium offers "no contrary opinion, not [sic] contrary evidence, and no reasonable basis" to contradict Ms. Cohen's conclusion about the $2.01 fair market value. (Dkt. No. 101-3 at 92.)  Relatedly, Plaintiff argues "Tanium did not produce, nor argued [sic] that the Grant Thornton valuation is mistaken, erroneous, incomplete, or otherwise improper."  (*Id.*) These arguments misunderstand Rule 702.  Plaintiff, as the proponent of the evidence, has the burden of demonstrating it is more likely than not that the testimony is based on sufficient data and the product of reliable methods.  *See* Fed. R. Evid. 702.  In its motion to exclude, Tanium need not prove Ms. Cohen's $2.01 valuation is incorrect.  Instead, Tanium argues—and the Court agrees—Plaintiff has failed to meet his burden of establishing Ms. Cohen's opinion on the $2.01 valuation is based on sufficient data and the product of reliable principles and methods.

So, the Court GRANTS in part the motion to exclude Ms. Cohen's report.  Ms. Cohen may

United States District Court
Northern District of California

testify as to Part A of her report and her opinion that the value of Tanium's preferred stock would be higher than the value of its common stock.  Otherwise, Ms. Cohen's report is inadmissible.[1]

## II.    DR. PHILLIP ALLMAN

### A.    Report

Phillip Allman has a Ph.D. in economics.  (Dkt. No. 107-1 ¶ 2.)  His "primary fields of expertise are econometrics, finance, and labor economics."  (*Id.*)  Dr. Allman was retained "to conduct an analysis of the current value of Daniel Howard's foregone Restricted Stock Units (RSU's) with Fortinet and foregone stock purchases from the Employee Stock Purchase Program (ESPP) with Fortinet as a result of ending his employment at Fortinet on April 14, 2016."  (*Id.* ¶ 3.)

Dr. Allman's report begins by calculating the value of the unvested RSUs Plaintiff earned while at Fortinet but forfeited upon leaving.  Dr. Allman concludes if Plaintiff "remained with Fortinet through February 1, 2020, all of the unvested RSU's would have vested and effectively converted to shares for Fortinet stock."  (*Id.* ¶ 5.)  "The current value of those shares is $1,439,953."  (*Id.*)

Second, Dr. Allman opines on Plaintiff's damages resulting from the loss of annual RSU grants from Fortinet.  Dr. Allman calculates damages according to three scenarios: (1) Plaintiff worked another five years at Fortinet; (2) Plaintiff worked at Fortinet through trial; and (3) Plaintiff worked at Fortinet for another ten years.  (*Id.* ¶ 6.)  Dr. Allman opines Plaintiff would earn $364,257 in additional RSU grants in the first scenario; $587,180 in the second scenario; and $611,967 in the third scenario.  (*Id.*)

Third, Dr. Allman calculates the "lost profits from the shares Mr. Howard would have had the opportunity to purchase" through Fortinet's Employee Stock Purchase Program, in which employees could withhold up to 15% of their salary to "effectively purchase Fortinet stock at a discount to the market price, twice per year."  (*Id.* ¶ 7.)  Dr. Allman tallied the ESPP damages figure at $1,139,081 based on an assumption Plaintiff would have withheld the maximum amount

---

[1] Having concluded the sections Tanium sought to exclude are inadmissible under Rule 702, the Court need not address Tanium's Rule 403 arguments.

United States District Court
Northern District of California

1    allowed (15%) through February 2019, when the program ended.  (*Id.* at 8.)

2        Finally, Dr. Allman adds the damages figures for the three time periods.  Dr. Allman

3    concludes that had Plaintiff remained at Fortinet five years after leaving, his damages would total

4    $2,943,291; had he remained at Fortinet through a trial date of April 2025, his damages would

5    total $3,166,213; and had Plaintiff remained at Fortinet for ten years after leaving, his damages

6    would total $3,191,100.  (*Id.* at 4.)

7        **B.    Analysis**

8            **1.    Stock Valuation**

9        For the unvested RSUs, RSU grants, and ESPP damages calculations, Dr. Allman uses

10    $107.66 as Fortinet's current share price.  (Dkt. No. 100-3 at 22-26.)  For example, to calculate

11    damages for the loss of unvested RSUs, Dr. Allman multiplies the unvested shares by $107.66.

12    (*Id.* at 22 (9,375 unvested shares x $107.66 per share = $1,009,313 total value of lost shares for

13    2014 RSU grant).)  Dr. Allman's report does not state what "current date" the $107.66 share price

14    reflects.  At oral argument, Plaintiff clarified $107.66 was Fortinet stock's price when Mr. Allman

15    drafted his report, dated February 10, 2025.  (*Id.* at 19.)

16        Dr. Allman's selection of a February 10, 2025 date to set the value of Tanium stock is

17    arbitrary, so damages calculated using the $107.66 date are arbitrary and unlikely to be helpful to

18    the jury.  At oral argument, Plaintiff argued at trial Dr. Allman could adjust his expert testimony to

19    reflect the current price of the stock as of the date of trial, but he provided no legal support for the

20    proposition that an expert can testify to something different than what is in their report.  Nor did

21    he provide a rationale for using the trial date to value the stock for damages purposes, which raises

22    its own set of questions: is it the first day of trial, the day on which the damages expert testifies, or

23    the day on which a verdict is entered?  These questions underscore the speculation and uncertainty

24    inherent in Dr. Allman's damages opinion.  *See Biren v. Equal. Emergency Med. Grp., Inc.*, 102

25    Cal. App. 4th 125, 138 (2002) ("Damage awards may not be based upon the testimony of experts

26    who rely on speculation.").

27        Dr. Allman's selection of a February 10, 2025 date is also contrary to California case law.

28    "For the breach of an obligation not arising from contract, the measure of damages . . . is the

United States District Court
Northern District of California

7

1    amount which will compensate for all the detriment proximately caused thereby, whether it could

2    have been anticipated or not."  Cal. Civ. Code § 3333.  Under section 3333, a plaintiff in a fraud

3    case "may recover 'out-of-pocket' damages in addition to benefit-of-the-bargain damages."  *Lazar*

4    *v. Superior Ct.*, 12 Cal. 4th 631, 646 (1996).  While "out of pocket" damages are usually

5    calculated at the time of the transaction, "'benefit of the bargain' damages may appropriately be

6    calculated as of the date of discovery of the fraud."  *Salahutdin v. Valley of California, Inc.*, 24

7    Cal. App. 4th 555, 568 (1994).  So, in *Salahutdin*, when the defendant misrepresented the size of

8    the property sold to the plaintiffs, the California Court of Appeal affirmed the trial court using the

9    date the plaintiffs discovered the fraud to value the property for damages purposes.  *Id.* at 569.

10   Likewise, in *Walsh v. Hooker & Fay*, when the plaintiff was induced to buy stock by a

11   stockbroker's false representations, the Court of Appeal affirmed a damages award of the

12   difference between the stock's cost to the plaintiff and the stock's value as of the date of the fraud

13   was discovered.  212 Cal. App. 2d 450, 451 (1963); *see also Munson v. Fishburn*, 183 Cal. 206,

14   219 (1920) ("The measure of damages here would be the amounts paid in by the plaintiff,

15   including the assessments, with interest thereon at the rate of seven per cent from the dates of such

16   payments, less the value of the stock at the time of the discovery of the fraud.").

17          While Tanium's motion to exclude did not argue Dr. Allman's selection of an arbitrary

18   date for valuing Fortinet stock as a basis to exclude, its memorandum on disputed jury instructions

19   raises this issue.  Tanium argues a defined date for purposes of valuing shares allows parties to

20   "assess settlement value, the type of experts to hire, and the potential attorneys' fees that may be

21   awarded, if available."  (Dkt. No. 120 at 8.)  Tanium seeks to instruct jurors "the value of the

22   Fortinet stock that [Plaintiff] gave up must be determined as of the date of the transaction, i.e., the

23   date he resigned from Fortinet."  (Dkt. No. 110 at 20.)  The Court disagrees with Tanium's

24   selection of the transaction date: Plaintiff is entitled to benefit of the bargain damages in this fraud

25   case, *see Lazar*, 12 Cal. 4th at 646, which "may appropriately be calculated as of the date of

26   discovery of the fraud."  *Salahutdin*, 24 Cal. App. 4th at 568.  But the Court agrees a cut-off date

27   is appropriate to make damages sufficiently certain.  *See Mozzetti v. City of Brisbane*, 67 Cal. App.

28   3d 565, 577 (1977) ("It is black-letter law that damages which are speculative, remote, imaginary,

United States District Court
Northern District of California

8

1    contingent or merely possible cannot serve as a legal basis for recovery.").  It follows that an

2    expert report valuing Fortinet stock according to a date unsupported by the record and contrary to

3    California case law is unlikely to help a jury.  So, Dr. Allman's calculations using that arbitrary

4    date are inadmissible under Rule 702.

5        Following oral argument, Plaintiff filed a supplemental brief on damages.  (Dkt. No. 128.)

6    Plaintiff's brief is procedurally improper.[2]  *See* N.D. Civ. Rule 7-3(d) ("Once a reply is filed, no

7    additional memoranda, papers or letters may be filed without prior Court approval . . . .").

8    Regardless, Plaintiff's supplemental brief does not alter the Court's analysis.  The cases Plaintiff

9    cites are unpersuasive because the courts applied contract law principles to calculate damages,

10   whereas the present case alleges fraud.  *See Brandon & Tibbs v. George Kevorkian Acct. Corp.*,

11   226 Cal. App. 3d 442, 454 (1990) ("The rules of law governing the recovery of damages for

12   *breach of contract* are very flexible.") (emphasis added); *Ho v. Marathon Pat. Grp., Inc.*, No.

13   5:21-CV-00339-SSS-SPX, 2025 WL 1625351, at *5 (C.D. Cal. May 7, 2025) ("Under California

14   law, the 'general rule' is to measure damages at *the date of breach*. . . . However, this rule is not

15   absolute.") (emphasis added); *Shah v. Skillz Inc.*, 101 Cal. App. 5th 285, 304 (2024) ("Although

16   damages in *breach of contract actions*, as a general rule, should be measured from the date of

17   breach under California law, that rule does not apply where, as here, there is no readily available

18   market for the stock at the time of the breach.") (emphasis added).  *Shah* is also distinguishable

19   because there was no readily available market for the stock at the time of the breach, whereas here,

20   Fortinet is a publicly traded company.  *See id.* at 302 (when "there is no available market for the

21   stock at the time of breach" then "the plaintiff cannot cover his damages by purchasing the lost

22   shares immediately upon the breach").  Moreover, in *Shah*, the stock was not valued as of the date

23   of trial; rather, the trial court used the price of the stock after the lock-up period preventing the

24   plaintiff from selling his stock ended.  *Id.* at 305.  So, *Shah* does not stand for the proposition that

25

26   _____

27   [2] The Court is in receipt of Tanium's motion to strike the supplemental brief, which argues
     Plaintiff does not provide authority for filing a supplemental brief and seeks leave to file a
     response.  (Dkt. No. 131.)  Because Plaintiff's supplemental brief does not change the Court's

28   analysis, the Court need not strike it.  That said, the Court grants Tanium leave to file a responsive
     supplemental brief and accepts as filed its brief at Docket. No. 131-1.

United States District Court
Northern District of California

stock values should be left open-ended through trial.

The only fraud case Plaintiff cites and relies on is *Lazar*.  Plaintiff argues the *Lazar* plaintiff "was allowed to recover for the value of what he left behind due to reliance on false representations made before the employment relationship began."  (Dkt. No. 128 at 2.)  In *Lazar*, the California Supreme Court held the plaintiff who was fraudulently induced to relinquish his secure job and relocate his family to another state based on his employer's false representations could "seek damages for the costs of uprooting his family, expenses incurred in relocation, and the loss of security and income associated with his former employment in New York."  12 Cal. 4th at 648–49.  But *Lazar* says nothing about how and when to value stock options.  And Plaintiff's supplemental brief does not explain why the Court should apply *Lazar* to conclude the stock may be valued as of the trial date when the *Salahutdin*, *Walsh*, and *Munson* courts affirmed measuring damages as of the date of the discovery of the fraud.  Indeed, Plaintiff's supplemental reply does not discuss these cases.

Even were the Court to conclude Dr. Allman's decision to value Fortinet stock as of February 10, 2025 goes to weight and not admissibility, Dr. Allman's report would remain inadmissible.  As described below, Dr. Allman's opinions on damages from unvested RSUs, RSU grants, and ESPP damages are not based on reliable methodologies.

### 2.    Unvested RSUs

Tanium moves to exclude Dr. Allman's opinion on the ground he "is nothing more than a testifying calculator and that is not helpful to the jury in determining and of the facts at issue."  (Dkt. No. 100-4 at 10.)  This argument is persuasive as to Dr. Allman's calculations regarding the value of Plaintiff's unvested RSUs.  For Plaintiff's 2015 RSU grant, for example, Dr. Allman determined Plaintiff received 2,000 shares after the 2022 "5 for 1 stock split" by multiplying the 400 RSUs Plaintiff received by five.  Dr. Allman then determined 1,500 of those shares were unvested when Plaintiff left Fortinet by subtracting from 2,000 the 500 shares that had vested.  Finally, he multiplied 1,500 shares by the $107.66 "current share price" to calculate the total value of lost shares from the 2015 RSU grant as $161,490.  Plaintiff or his counsel can argue these simple calculations to the jury, indicating Dr. Allman's opinion is not based on his scientific,

technical, or other specialized knowledge as required by Rule 702.

What's more, Dr. Allman did not subtract income taxes from the total damages figure. At oral argument, Plaintiff agreed income taxes would have to be paid on the unvested RSUs. However, Plaintiff could not point to anything in Dr. Allman's report indicating his damages calculations accounted for income taxes. So, Plaintiff fails to establish it is more likely than not that Dr. Allman's damages opinion regarding unvested RSUs is the product of reliable principles and methods. *See* Fed. R. Evid. 702.

### 3. RSU Grants

Tanium moves to exclude Dr. Allman's opinion regarding Fortinet's future RSU grants on the ground it is entirely speculative. Dr. Allman opines future RSU grants would equal 8.3% of Plaintiff's future salary year to year and using that figure, calculates loss of RSU grants assuming continued employment for five years, ten years, and through trial. Dr. Allman got the 8.3% percentage by averaging the value of the Fortinet RSU grants Plaintiff received during the two years he worked at Fortinet: in 2015, the RSU grant equaled 8.74% of Plaintiff's salary, and in 2016, the RSU grant equaled 7.71% of Plaintiff's salary. (Dkt. No. 107-1 at 10.)

Dr. Allman's methodology for calculating future RSU grants is not tied to data about the RSUs Tanium granted to employees from 2017 onward. (Dkt. No. 107-1 at 35 ("[Question]: But you don't have any data about the actual granting of RSUs during the subsequent years by Fortinet, do you? [Dr. Allman]: No. . . .").) And Dr. Allman also admits he cannot determine what RSU grants would have been:

> Q: But you have no way of determining how many shares of RSUs that he would have been granted during those subsequent years, do you?
> . . .
> THE WITNESS: We don't have any way of knowing what they would have been from year to year, but this projects an average that gives us our best expectation over the course of time as an average with ups and downs.

(Dkt. No. 107-1 at 36.) The methodology Dr. Allman uses to overcome this gap in knowledge—averaging the previous two years of RSU grants—is not based on his specialized expertise. Dr. Allman is an economist, not an expert in corporate stock options and valuation. As an economist,

United States District Court
Northern District of California

United States District Court
Northern District of California

Dr. Allman cannot and does not opine that RSU grants can be calculated as a percentage of an employee's salary and that such percentage is likely to remain consistent over five- and ten-year periods.  His opinion is also inconsistent with actual data on Fortinet's RSU grants.  Tanium's expert, Neil Beaton, provided a graph with annual Fortinet RSU grants by year:



(Dkt. No. 103-9 ¶ 18.)  Mr. Beaton observes "Fortinet decreased its RSU grants by 24.34 percent, 2.38 percent, 34.15 percent, and 29.63 percent in 2016, 2017, 2018, and 2019, respectively."  (*Id.*)  So, Dr. Allman's opinion that Plaintiff's RSU grant would remain a steady 8.3% of his salary in 2018 and 2019 while Fortinet was reducing its annual RSU grants by 29-34% during this period is not "based on sufficient facts or data."  *See* Fed. R. Evid. 702.

In sum, there is no expertise, methodology, or reliable data behind Dr. Allman's testimony as to likely future Fortinet RSU grants.  He is no more qualified to provide such testimony than Mr. Howard himself or Plaintiff's counsel.  So, Dr. Allman's opinion regarding RSU grants does not involve Dr. Allman's specialized knowledge.

### 4.    Employee Stock Purchase Program

Tanium also moves to exclude Dr. Allman's ESPP damages calculations on the ground Dr. Allman calculated the total appreciation of the stocks Plaintiff could have purchased, not the value of the discount the ESPP plan provided.  The Court agrees the methodology by which Dr. Allman

calculated ESPP damages is not reliable, so his ESPP damages opinion is inadmissible.

Through ESPP, employees could use up to 15% of their Fortinet salary to buy stock at 85% of the price the stock was then trading.  (Dkt. No. 107-1 at 3, 9.)  On August 15, 2016, for example, Plaintiff could have spent $11,875 (15% of his $79,164 salary) to purchase stock at $4.32 per share (85% of the $5.08 share price).  (*Id.* at 9.)  Dr. Allman thus determined Plaintiff could have purchased 2,748 shares ($11,875/$4.32 = 2,748 shares).  To calculate damages, Dr. Allman multiplied the 2,748 shares Plaintiff could have purchased by $103.34, which represents the share's appreciation (calculated by subtracting from the $107.66 current share price the discounted purchase price of $4.32).  So, according to Dr. Allman's damages model, Plaintiff incurred $283,961 in damages from his inability to participate in the August 2016 ESPP program.

Dr. Allman's methodology calculates ESPP damages as the appreciation of the shares Plaintiff could have purchased through Fortinet's program.  This fails to account for the fact that after leaving Fortinet, Plaintiff could have purchased Fortinet stock on the public market.  And in fact, he did:

> Q:  Okay. So how many shares did you retain when you left Fortinet?
> A:  I didn't have any when I quit.
> Q. But you have them now; right?
> A. I have them now.
> Q. Do you have any shares of Fortinet today?
> A. I have shares of Fortinet that I've purchased.

(Dkt. No. 100-5 at 167-68.)  As Tanium observes, ESPP is "effectively a 15% coupon on Fortinet stock" whose value, "like any coupon, is the value of the discount."  (Dkt. No. 100-4 at 14.)  In August 2016, Plaintiff could have purchased Fortinet shares by paying the $5.08 per share rather than the $4.32 ESPP price.  Accordingly, damages from his inability to participate in ESPP should reflect the 76-cent discount Plaintiff did not receive, not the $103.34 the stock has appreciated since August 2016.  The former figure is $2,088.48 ($0.76 x 2,748).  The latter figure, in Dr. Allman's report, is $283,961 ($103.34 x 2,748).

Plaintiff argues "ESPP is not simply a vehicle to acquire discounted stock" but a "structured, tax-advantaged, payroll-integrated opportunity with characteristics unavailable in general market participation."  (Dkt. No. 100-4 at 94.)  But this does not support the reliability of

1    Dr. Allman's report—there is no indication Dr. Allman considered these benefits.  And while it

2    may be true that, accounting for tax and other advantages, Plaintiff's losing access to ESPP

3    resulted in damages greater than $2,088.48, it remains true that Dr. Allman's opinion results in a

4    significant overstatement of Plaintiff's damages due to its flawed methodology.  Plaintiff has not

5    shown that a damages calculation that overestimates damages by hundreds of thousands of dollars

6    is more likely than not helpful to the jury and more likely than not the product of reliable methods.

7    *See* Fed. R. Evid. 702.  So, Dr. Allman's ESPP damages opinion is inadmissible.

8        So, the Court GRANTS the motion to exclude Dr. Allman's report.

9    **III.    NEIL BEATON**

10       **A.    Report**

11       Neil Beaton is a Managing Director at Alvarez & Marsal Valuation Services, LLC who

12   "specialize[s] in business valuations, mergers, and acquisition support, litigation consulting, and

13   economic analysis."  (Dkt. No. 103-9 ¶ 1.)  He is a Certified Public Accountant, among other

14   accreditations.  (*Id.* ¶ 2.)  His report "provide[s] rebuttal to" Plaintiff's claim that had he remained

15   Fortinet, he would have "earned over $1 million more than he did at Tanium."  (*Id.* ¶¶ 3, 13.)  To

16   do so, Mr. Beaton compares Plaintiff's "overall compensation at Fortinet . . . to his offer at

17   Tanium," including the salaries, bonuses, and RSU grants at each.  (*Id.* ¶¶ 13-15.)  Then Mr.

18   Beaton describes the significance of 409A valuations, in part by comparing Tanium's 409A

19   valuations with tenders offers it made to employees and prices it offered investors.  (*Id.* ¶¶ 19-26.)

20       **B.    Analysis**

21          **1.    Plaintiff's Employment Trajectory**

22       First, Plaintiff seeks to exclude Mr. Beaton's opinion that Plaintiff "would not have

23   remained employed at Fortinet even if Tanium had not misrepresented the stock valuation" on the

24   ground such opinion is outside Mr. Beaton's expertise.  (Dkt. No. 103-2 at 18-19.)  Mr. Beaton

25   offers this opinion in his rebuttal report, too, stating "it is more probable than not that Mr. Howard

26   would not have remained employed at Fortinet for five years let alone ten years."  (Dkt. No. 103-6

27   ¶ 10.)  The Court agrees this testimony falls outside the scope of Mr. Beaton's expertise.  An

28   expert in labor economics or employment forecasting might be qualified to opine about whether a

14

United States District Court
Northern District of California

decline in stock price and RSU grants at Fortinet would compel Plaintiff to seek other employment. Mr. Beaton is not that expert. (*Id.* ¶ 1 (Mr. Beaton "specialize[s] in business valuations, mergers, and acquisition support, litigation consulting, and economic analysis.").)

Tanium's arguments to the contrary are not persuasive. First, Tanium asserts Mr. Beaton "has even been qualified as an expert before in employment matters." (Dkt. No. 103-3 at 14.) But Tanium refers to Mr. Beaton's work as a vocational expert "testify[ing] as to the employability of an individual claiming that he or she cannot work or could not find a job." (Dkt. No. 103-16 at 4.) That Mr. Beaton was qualified to determine whether an individual was able to perform the essential functions of a job does not qualify him to opine on how long Plaintiff would have stayed at Fortinet. *See Avila v. Willits Env't Remediation Tr.*, 633 F.3d 828, 839 (9th Cir. 2011) (stating an expert must "stay[] within the reasonable confines of his subject area").

Tanium also cites a district court case for the proposition that a witness need not have formal education to be qualified as an expert. *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 984 F. Supp. 2d 1021 (C.D. Cal. 2013). In *Countrywide*, the court concluded the expert's statistical analysis was admissible because even though he did "not claim to be a statistician," he "studied statistics during his education in economics, use[d] statistical analysis in his published articles, and [taught] courses that discuss statistical issues." *Id.* at 1028. Here, Mr. Beaton does not claim to be a labor market expert, nor does he have relevant experience or studies in that field to render an expert opinion on this subject. Finally, Tanium asserts "it is obvious that Plaintiff was looking to leave Fortinet considering his response to a recruiter via LinkedIn for the Tanium position." (Dkt. No. 103-3 at 14.) But if it is "obvious," then Mr. Beaton's expert testimony on this topic is improper. *United States v. Vallejo*, 237 F.3d 1008, 1019 (9th Cir.) ("To be admissible, expert testimony must . . . address an issue beyond the common knowledge of the average layman."). So, while Mr. Beaton may opine about the value of Fortinet's stock and its annual RSU grants, he may not testify whether either led Plaintiff to seek new employment.

## 2.    Other Opinions

The Court is unpersuaded by Plaintiff's arguments to exclude the remainder of Mr. Beaton's report. First, Plaintiff moves to exclude on the ground Mr. Beaton failed to perform "any

1   valuation of Tanium's common stock as of March 2016." (Dkt. No. 103-2 at 14.) This is not

2   grounds for exclusion because Mr. Beaton does not purport to opine on to the value of Tanium's

3   stock in March 2016.

4   Second and relatedly, Plaintiff argues Mr. Beaton improperly dismissed Grant Thornton's

5   409A valuation, contending Mr. Beaton "asserts, without analysis, that the 409A appraisal was

6   'performed for tax purposes' and therefore irrelevant to determining [fair market value]." (Dkt.

7   No. 103-2 at 15.) Mr. Beaton's report does not conclude the 409A valuation is irrelevant. Instead,

8   his report states 409A valuations "are utilized by boards of directors as guidance to assist them in

9   determining a price for equity transactions." (Dkt. No. 103-9 ¶ 23.) To support this conclusion,

10  Mr. Beaton refers to the company's audited financial statements, which state:

12      The fair value of the common stock underlying the stock option
        awards was determined by the Board of Directors. Given the absence
13      of a public trading market, the Board of Directors considered
        numerous objective and subjective factors to determine the fair value
14      of our common stock at each meeting at which awards were approved.
        These factors included, but were not limited to (i) **contemporaneous**
15      **third-party valuations of common stock**; (ii) the rights, preferences
        and privileges of convertible preferred stock relative to common
16      stock; (iii) the lack of marketability of common stock; (iv) stage and
        development of the Company's business; (v) general economic
17      conditions and (vi) the likelihood of achieving a liquidity event, such
        as an IPO or sale of the Company, given prevailing market conditions.

18  (Dkt. No. 103-9 ¶ 23 (citing Tanium, Inc._000168 and Tanium, Inc._000349-350) (emphasis in

19  original).) So, contrary to Plaintiff's assertion, Mr. Beaton does not conclude 409A valuations are

20  irrelevant but instead that such valuations are one of several factors used to determine fair value.

21  Third and relatedly, Plaintiff moves to exclude on the ground Mr. Beaton ignored

22  contemporaneous financial data, including Deloitte's Consolidated Financial Statements which

23  "report grant-date fair values for RSUs." (*Id.* at 17.) According to Plaintiff, "this failure to

24  engage with the best available contemporaneous data disqualifies *his valuation opinion* under Rule

25  702." (*Id.* (emphasis added).) But Mr. Beaton did not render a valuation opinion. He opines that

26  a 409A valuation by itself does not determine fair market value of RSUs. So, his failure to

27  account for valuations set forth in consolidated financial statements does not render this opinion

28  unreliable.

1    Fourth, Plaintiff argues Mr. Beaton's report is unreliable because it "relies on tender offers

2  from 2018 to 2020 and stock prices at the time of the RSU vesting—years after the alleged

3  misrepresentation" while "provid[ing] no methodology or economic rationale to bridge that

4  temporal gap."  (Dkt. No. 103-2 at 13.)  Plaintiff's motion later raises the same argument a second

5  time, asserting Mr. Beaton "cites tender offers occurring in 2018-2020, as well as RSU vesting

6  values, to argue that Tanium's $5/share representation to Howard in March 2016 was reasonable"

7  without providing "economic rational to link the later tender offers back to March 2016."  (*Id.* at

8  18.)  But Mr. Beaton does not use the subsequent tender offers to establish the fair market value of

9  Plaintiff's RSU grant.  Instead, Mr. Beaton discusses the 2018 through 2020 tender offers to

10  support his conclusion that 409A valuations are not the sole measure for determining fair market

11  value.  After recounting various sales and tender offers made from 2015 to 2018, Mr. Beaton

12  observes "[a]ll of these sales and purchases of the Company's securities were above the common

13  stock values set forth in the Company's 409A valuations."  (Dkt. No. 103-9 ¶ 25.)  Mr. Beaton

14  makes the same observation in recounting subsequent tender offers.  (*Id.* ¶ 26.)  Mr. Beaton does

15  not opine on the fair market value of Mr. Howard's RSUs.  So, Plaintiff's concern that he relies on

16  subsequent events for "a valuation of the relevant period" is unfounded.  (Dkt. No. 103-2 at 18.)

17    Fifth, Plaintiff moves to exclude on the ground Mr. Beaton failed to analyze the difference

18  between preferred and common stock.  In his deposition and rebuttal report, Mr. Beaton stated this

19  factor does not change his opinion.  (Dkt. No. 103-6 ¶ 15 ("Many secondary sales include both

20  preferred and common stock being sold at the same price in spite of the contractual benefits

21  bestowed on the preferred stock."); Dkt. No. 103-16 at 6 ("Q: Is it your understanding . . . that

22  preferred stock and common stock have the same value?  A: Many times, they do, yes, especially

23  in the later-stage companies when the optionality of the value of the company exceeds the

24  economic value of all the provisions of the preferred stock.").)  Plaintiff, while noting his expert's

25  determination that preferred shares carry enhanced rights, does not offer legal support for his

26  argument that failure to discuss common and preferred stock renders the report so unreliable as to

27  warrant exclusion.  This goes to weight, not admissibility.  *See Kennedy v. Collagen Corp.*, 161

28  F.3d 1226, 1230–31 (9th Cir. 1998) ("[T]he factfinder may be confronted with opposing experts,

United States District Court
Northern District of California

. . . which may increase or lessen the value of the expert's testimony. But their presence should not preclude the admission of the expert's testimony—they go to the *weight,* not the admissibility.").

### C.    Rebuttal

In his rebuttal report, Mr. Beaton challenges conclusions in Dr. Allman's and Ms. Cohen's reports. Plaintiff moves to exclude these rebuttal opinions. Having excluded Dr. Allman's report, Plaintiff's motion is moot as to Mr. Beaton's rebuttal to that report.

Regarding Mr. Beaton's rebuttal to Ms. Cohen's report, Plaintiff moves to exclude on the ground Mr. Beaton's critiques "consist[] of little more than disagreement with her conclusions— without modeling, without analysis, and without foundation." (Dkt. No. 103-2 at 23.) Plaintiff's motion is moot as to paragraphs 13, 14, and 16 of Mr. Beaton's rebuttal since the Court excluded the opinions these paragraphs seek to rebut. In paragraph 15 of his rebuttal report, Mr. Beaton describes his understanding of common stock and preferred stock, responding to Ms. Cohen's conclusion the value of Tanium's preferred stock would be higher than the value of its common stock. This falls within Mr. Beaton's expertise in business valuations and will be helpful to jurors assessing the credibility of Mr. Cohen's report, so this part of the rebuttal is admissible.

So, the Court GRANTS in part Plaintiff's motion to exclude. Mr. Beaton cannot testify about when and whether Plaintiff would have left Fortinet; otherwise, his report is admissible. Regarding his rebuttal report, Mr. Beaton may testify as to paragraph 15 regarding common versus preferred stock. The remainder of Plaintiff's arguments to exclude are moot because the Court excluded the opinions of Dr. Allman and Ms. Cohen that Mr. Beaton intended to rebut.

## IV.    MARCIA WAGNER

### A.    Report

Ms. Wagner is the principal of The Wagner Law Group and "an attorney working exclusively in the areas of employee benefits law and executive compensation." (Dkt. No. 102-5 ¶ 2.) She "ha[s] been recognized as a national expert on a variety of executive compensation issues, including tax, accounting, securities, stock exchange, corporate governance, and litigation risks associated with executive compensation." (*Id.* ¶ 3.) Her report provides her "preliminary opinions

United States District Court
Northern District of California

1    concerning a discrepancy between" Tanium's determination of $5 per share as the fair value of the

2    RSUs and Grant Thornton's $2.01 per share valuation of the same.  (*Id.* ¶ 1.)  It is offered as a

3    rebuttal to Mr. Beaton's report.  (*Id.* ¶ 17.)

4         In the report, Ms. Wagner reviews the four standards the Grant Thornton report analyzed to

5    reach the $2.01 figure, including the applicable IRS revenue rulings and treasury regulations

6    informing those standards.  (Dkt. No. 102-5 ¶¶ 23-32.)  Ms. Wagner states "none of the Four

7    Standards applied in the Grant Thornton report suggests that its fair market value determinations

8    are so nuanced or arcane as to warrant considering them to be disconnected from providing a fair

9    value estimate for the shares of privately-held companies."  (*Id.* ¶ 33.)  Then, she discusses the tax

10   implications and consequences of Tanium "us[ing] $2.01 per share as fair market value for tax and

11   financial statement purposes and $5 per share for recruiting or other purposes," including "under-

12   reported income and inadequate federal tax withholding for vested restricted stock and RSU

13   awards."  (*Id.* ¶¶ 35-36.)  She states "consistency in valuation decisions is generally considered

14   critical in order to withstand IRS scrutiny in the event of audit or other challenges."  (*Id.* ¶ 37.)

15        **B.    Analysis**

16             **1.    Timeliness**

17        First, Tanium argues Ms. Wagner's opinion should be excluded as an "untimely disclosed

18   expert opinion" or else "limited to rebutting the opinions presented in paragraph 22 of the Beaton

19   report." (Dkt. No. 102-4 at 12.)  Rebuttal expert disclosures must "contradict or rebut evidence on

20   the same subject matter identified by another party."  Fed. R. Civ. P. 26(a)(2)(D)(ii).  "Rebuttal

21   testimony cannot be used to advance new arguments or new evidence" or to "set forth an alternate

22   theory."  *Matthew Enter., Inc. v. Chrysler Grp. LLC*, No. 13-CV-04236-BLF, 2016 WL 4272430,

23   at *2 (N.D. Cal. Aug. 15, 2016).  Rebuttal testimony is proper when it "addresses the same subject

24   matter that the initial experts address and does not introduce new arguments."  *Perez v. State Farm

25   Mut. Auto. Ins. Co.*, No. C 06-01962 JW, 2011 WL 8601203, at *8 (N.D. Cal. Dec. 7, 2011).

26        Ms. Wagner's report states she reviewed Mr. Beaton's report and "fundamentally disagree

27   with his discussion in paragraph 22."  (Dkt. No. 102-5 ¶ 17.)  In full, paragraph 22 of Mr. Beaton's

28   report states:

One basis of Mr. Howard's claim is that the fair market value of Tanium's common stock was fraudulently represented to him in that it was actually $2.01 per share rather than $5.00 per share as was alleged to have been told to him. However, the $2.01 valuation was derived from a 409A valuation report prepared by Grant Thornton, LLP, as of December 31, 2015. As previously stated, 409A valuations are performed by independent valuation firms for tax purposes under Internal Revenue Code §409A. They do not represent the fair market value of similar securities in the open market. Mike Curran, Tanium's Vice President of Global Talent, indicated that "the 409a valuation is what the auditing firm places on the company for tax purposes. We [Tanium] like to focus on what the market is paying for a common stock in Tanium. Once again, the last transacted value." Merissa Villalobos, a former recruiter and talent acquisition manager at Tanium, reiterated a number of times that the Tanium share price quoted to potential employees was based on the latest buyback or sale price of the Company's securities.

(Dkt. No. 103-9 ¶ 22 (footnotes omitted).)

While not always explicit, Ms. Wagner's report responds to Mr. Beaton's opinion expressed in this paragraph and throughout the report that 409A valuations do not represent the fair market value of a security. That is, Mr. Beaton opines a company can determine a fair market value for RSUs that differs from their 409A valuation, which is primarily used for tax purposes. Ms. Wagner rebuts this opinion by asserting a company should be consistent in how it represents fair market value. And Mr. Beaton opines a company can use recent transactions to set fair market value. Ms. Wagner rebuts this opinion by asserting the Grant Thornton valuation incorporates an analysis of recent transactions. In this way, except in the instance described below, her report "addresses the same subject matter that [Mr. Beaton] address[es] and does not introduce new arguments." *See Perez*, 2011 WL 8601203, at *8.

### 2.     Testimony re: Shareworks Statement

Tanium also argues for exclusion on the ground Ms. Wagner's opinion is not based on "sufficient facts or data" as required by Rule 702 because her opinion "is premised in part on a misunderstanding of the tax withholdings when Plaintiff's RSUs vested." (Dkt. No. 102-4 at 13.) Tanium focuses on Ms. Wagner's analysis of an account statement from Shareworks by Morgan Stanley Tanium provided to Plaintiff ("the Shareworks Statement"), which describes options for paying taxes on the vested RSU grants. Regarding this statement, Ms. Wagner's report states:

> Tables in the Shareworks Statement identify "release dates" in 2018 on June 15, September 15, and December 15 for purposes of applying federal withholding tax rules applicable to Plaintiff's RSU awards vesting on each of the three vesting dates. Those tables indicate that Tanium relied upon valuation reports by Grant Thornton or others not only for communicating the value of common stock awarded to Plaintiff, but also for making tax withholding determinations when vesting occurred for the awards released on September 15 and December 15 (with Plaintiff choosing to pay those taxes in cash for the June 15, 2018 release date).

(Dkt. No. 102-5 ¶ 19.)  Tanium argues Ms. Wagner was wrong when she stated "the 409A valuation of $2.01 was used by Tanium 'for making tax withholding determinations when vesting occurred.'"  (Dkt. No. 102-4 at 13 (quoting Dkt. No. 102-5 ¶ 19).)  Having reviewed the Shareworks Statement and Ms. Wagner's deposition testimony on this point, the Court agrees.

In the Shareworks Statement for the June 2015 release date, Plaintiff was offered the option to pay taxes and receive all RSUs, with a "gross release value" of $81,900.  (Dkt. No. 44-9 at 4.)  Ms. Wagner testified $81,900 is the amount Plaintiff should have been taxed as regular income for releasing the shares on this date.  (Dkt. No. 102-3 at 59.)  For the December 2018 release date, the Shareworks Statement offered Plaintiff the option to withhold shares to cover taxes, the withheld shares being valued at $4,720.42.  (Dkt. No. 44-9 at 4.)  In her deposition, Ms. Wagner agreed these figures reflecting Plaintiff's tax obligations ($81,900 and $4,720.42) were based on the share's *release price*, not on its *market price at the time of grant*:

> Q: Okay. Would you agree with me, then, based upon the Shareworks statement produced by Mr. Howard, that the withholding done, at least on 17 December, was not based on a 2.01 valuation but rather a 6.58 release price?
>
> A: Yes, I would.

(Dkt. No. 102-3 at 60.)  Specifically, she testified that the $81,900 figure was the product of multiplying the $5.46 release price by 15,000 shares disbursed.  Likewise, she testified the $4,270.42 withholding figure was the product of multiplying the $6.58 release price by 649 restricted shares withheld.  (*Id.* at 59-60.)  So, while the Shareworks Statement lists the "market price at the time of grant" as $2.01, Ms. Wagner confirmed that figure was not used to calculate Plaintiff's tax withholding obligations.  Because Ms. Wagner's deposition testimony amounts to an acknowledgement she misinterpreted the Shareworks Statement, Ms. Wagner may not opine

United States District Court
Northern District of California

1    that this Statement shows Tanium used the $2.01 valuation "for maxing tax withholding

2    determinations when vesting occurred."  (Dkt. No. 102-5 ¶ 19.)

3          In arguing against this conclusion, Plaintiff insists "Wagner acknowledges that the 409A

4    valuations were used to report taxes for Howard's vesting values."  (Dkt. No. 106-2 at 40.)

5    Plaintiff thus reasserts Ms. Wagner's misinterpretation of the Shareworks Statement.  While the

6    $2.01 valuation is listed on the Shareworks Statement, Ms. Wagner acknowledged it was not used

7    to calculate Plaintiff's tax obligations.

8          Even were the Court to conclude Ms. Wagner's testimony about the Shareworks Statement

9    is reliable under Rule 702, that opinion is unrelated to Mr. Beaton's report.  Mr. Beaton's report

10   does not discuss the Shareworks Statement or the taxes Plaintiff withheld or how Tanium

11   calculated tax withholding obligations.  Because Ms. Wager's opinion regarding the Shareworks

12   Statement "advance[s] new arguments" rather than responding to criticisms of Mr. Beaton's

13   methodologies, this portion of the report exceeds the permissible scope for rebuttal testimony.  *See*

14   *Perez*, 2011 WL 8601203, at *8.

15                    **3.    Relevance**

16         Tanium also argues Ms. Wagner's opinion will not help the trier of fact because her

17   "proposed testimony is not relevant in this matter."  (Dkt. No. 102-4 at 12.)  Tanium asserts the

18   tax consequences Ms. Wagner describes result when an employer or employee relies on a

19   valuation different from the 409A valuation *at the time of vesting*, whereas the 409A valuation at

20   issue in this case was performed shortly before the RSUs were *granted*.  So, Tanium argues, her

21   opinions about the "parade of horribles" that results if an employer relies on a valuation different

22   from a 409A valuation are not material.  Relatedly, Tanium argues Ms. Wagner's opinion should

23   be excluded under Rule 403 because "it is unfairly prejudicial in that it appears to the jury as

24   though Tanium is not in compliance with the tax law and regulations when such is not supported

25   by the record."  (Dkt. No. 102-4 at 15.)  *See* Fed. R. Evid. 403 ("The court may exclude relevant

26   evidence if its probative value is substantially outweighed by a danger of one or more of the

27   following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time,

28   or needlessly presenting cumulative evidence.").)

United States District Court
Northern District of California

The Court agrees Ms. Wagner's opinions regarding tax consequences are inadmissible. This case is not about whether Tanium complied with tax law.  In any event, Plaintiff identifies no evidence in the record showing Tanium has not.  As such, Ms. Wagner may not testify about criminal and civil penalties that "could result" from underreporting income and improper tax withholding because such hypothetical scenarios are irrelevant, unsupported by the record, and likely to mislead a jury.  (Dkt. No. 102-5 ¶ 13.)  Specifically, Ms. Wagner may not testify to paragraphs 34, 35, 36, 37(c), and 40 of her report.  Paragraph 39 is also inadmissible—Ms. Wagner is unable to testify as to what "Plaintiff believed he was receiving"—except for the last sentence regarding the Grant Thornton Report.

So, the Court GRANTS in part the motion to exclude Ms. Wagner's testimony.  Ms. Wagner may not testify that according to the Shareworks Statement, Tanium used the $2.01 valuation "for maxing tax withholding determinations when vesting occurred."  (Dkt. No. 102-5 ¶ 19.)  And Ms. Wagner may not opine that Tanium violated tax law and the corresponding penalties.  Otherwise, Ms. Wagner may testify to the opinions in her report to rebut Mr. Beaton's testimony.

## CONCLUSION

For the reasons above, the Court GRANTS Tanium's motion to exclude the expert report and testimony of Dr. Allman.  The Court GRANTS in part Tanium's motions to exclude the expert report and testimony of Ms. Cohen and Ms. Wagner.  And the Court GRANTS in part Plaintiff's motion to exclude the expert report of Neil Beaton.  The experts' testimony must be consistent with this order.

This Order disposes of Docket Nos. 104, 105, 106, and 107.

**IT IS SO ORDERED.**

Dated: June 27, 2025

JACQUELINE SCOTT CORLEY
United States District Judge